### STATE of Delaware,

v.

### Michael D. HOLDEN, Defendant.

### C.A. Nos. IN 10–03–0545, IN 10–03–0546, IN 10–03–0547, IN 10–03–0548.

Superior Court of Delaware, New Castle County.

Submitted: Sept. 23, 2010.

Decided: Dec. 14, 2010.

---

Brian J. Robertson, Deputy Attorney General, Department of Justice, State of Delaware, Wilmington, Delaware.

John P. Deckers, Attorney for the Defendant, Wilmington, Delaware.

## *OPINION*

JURDEN, J.

### INTRODUCTION

Before the Court is Defendant Michael D. Holden's Motion to suppress evidence seized as a result of a traffic stop facilitated by the use of Global Positioning System ("GPS") that law enforcement officials placed on the Defendant's vehicle weeks earlier without the Defendant's consent or a warrant. For the reasons that follow, the Court finds that, absent exigent circumstances, the warrantless placement of a GPS device to track a suspect 24 hours a day constitutes an unlawful search. In this case, there was insufficient probable cause independent of the GPS tracking to stop Holden's vehicle where and when it was stopped,[1] and therefore, the evidence seized from Holden's vehicle must be suppressed.

---

1. In its brief, the State asserts that it had other sources of information to justify the stop of the vehicle but it does not specifically argue inevitable discovery, and therefore, this opinion does not address that argument.

## BACKGROUND

A Drug Enforcement Administration Task Force[2] ("Task Force") received information from two separate confidential sources regarding the Defendant, Michael Holden. In May of 2009, one source, a past-proven informant, identified Holden as a distributor of cocaine. In January of 2010, Holden was also identified by that same source, and by another informant, as part of a marijuana distribution network operating in New Castle County, Delaware. The Task Force learned that the network was supplied through regular shipments in excess of 100 pounds of marijuana being transported from Texas or Florida, and that Holden was directly supplied with ten pound deliveries of marijuana. One of the sources advised that the distribution point was in New Jersey not far from the Delaware Memorial Bridge.

The Task Force wanted to track Holden. It learned through the informants that Holden regularly drove a white 1998 Lexus. On February 5, 2010, a law enforcement officer attached a battery-operated GPS tracking device on the Lexus while it was parked on a public street. No warrant was sought or obtained. The GPS device provided the Task Force with round the clock information about the vehicle's whereabouts.

After the installation of the GPS device, nearly three weeks passed without discovery of *any* facts to corroborate the information supplied by informants. On February 24th, officers were alerted by one of the informants that Holden would be picking up a shipment of marijuana that day. Still no warrant was sought or obtained. In the early evening, officers observed the GPS tracker indicating that the Lexus had departed Newark and was traveling over the Delaware Memorial Bridge into New Jersey. Officers used the GPS tracker to locate the Lexus parked in the driveway of a house in Carney's Point, New Jersey, less than four miles from the Delaware Memorial Bridge. Officers from the Task Force set up physical surveillance at the house, but the officers' view of the activities at the house was sometimes obstructed.

The officers observed two other vehicles parked in the driveway: a white Nissan Altima and a black BMW. A white Chrysler minivan was observed pulling up to the residence and backed into the driveway in front of the garage. After the van pulled into the driveway, one of the garage doors opened. Within five minutes, the garage door was closed again. Shortly thereafter the garage door closed, an unknown individual entered Holden's vehicle, removed a suitcase on wheels and went to the area of the garage. A brief time later, an unknown individual entered the Altima and drove it away. The Altima returned a short time later and an unknown individual placed the suitcase with wheels into the Altima. Another subject placed a duffel bag in Holden's vehicle. The Task Force did not see Holden in the Lexus at Carney's Point. Both the Lexus and the Altima then left the house and proceeded over the Delaware Memorial Bridge into Delaware.

The Task Force did not follow the Lexus into Delaware but relied on the GPS tracking device to track it as it traveled. The Task Force contacted the Delaware River and Bay Authority ("DRBA") Police and requested that it stop and search the Lexus. The search of the vehicle resulted in the seizure of a duffle bag with ten pounds of marijuana and drug paraphernalia. The State has not argued that the DRBA Po-

---

2. The DEA Task Force is comprised of federal, state and local sworn law enforcement officers assigned to investigate higher-level illegal distributors of controlled substances.

lice had probable cause to stop the vehicle at that time other than through information obtained by tracking the vehicle through the GPS device. The Defendant was the driver of the vehicle.

## GPS TRACKING TECHNOLOGY

GPS vehicular tracking systems consist of three components: (i) a receiver on the target vehicle which calculates the vehicle's location through the use of satellites; (ii) a cellular telephone or other technology which transmits the vehicle's position; and (iii) a computer monitoring device which receives and stores location information and uses mapping software to display the vehicle's location. The location data may be stored in computer files which could permit a report referencing the vehicle's past locations to be generated in the future. GPS devices operated by batteries permit the device to be attached anywhere on a vehicle and do not require access to the interior of the vehicle.[3] The battery on a GPS device can last for many weeks without needing to be recharged.

GPS technology greatly enhances law enforcement's ability to effectively monitor and locate suspects. When synchronized with mapping software, it allows investigators a constant real-time view of the target's position. GPS receivers equipped with a transmitter can easily record and relay relatively accurate positional information 24 hours a day to third-parties.[4]

GPS technology is growing increasingly more sophisticated, concealable, inexpensive and pervasive.[5] Law enforcement can use GPS far more widely than they were ever able to use visual surveillance, thereby significantly increasing the number of vehicles exposed to the 24/7 monitoring facilitated by this technology.[6]

## THE PARTIES' CONTENTIONS

Defendant argues that warrantless, prolonged, constant tracking of his vehicle constitutes an unreasonable search, and

3. GPS devices that do not have their own internal battery source must be placed such that they can be attached to the vehicle's battery.

4. *Commonwealth v. Connolly*, 454 Mass. 808, 913 N.E.2d 356, 362 (2009) ("A GPS device is capable of operating twenty-four hours a day with no human intervention.").

5. GPS devices are now accurate to six feet outdoors and soon will be accurate to three feet and indoors. Renee McDonald Hutchins, *Tied Up In Knotts? GPS Technology and The Fourth Amendment*, 55 UCLA L.Rev. 409, 414–422 (2007) (describing GPS technological advancement and uses); *See* Steven Penney, *Reasonable Expectations of Privacy and Novel Search Technologies: An Economic Approach*, J.Crim. L. & Criminology, Vol. 97, No. 2, 516–17 (2007) ("The accuracy of GPS tracking has improved steadily over the years, and further improvement is expected."); And such devices are getting smaller. *Compact GPS Tracks Footsteps Around the World*, GPS World, Jan. 2006, at 64; Press Release, Digi-

tal Angel Corp., Digital Angel Miniaturizes GPS Transmitting Technology: Matchbook–Size Device Opens Way to Monitor People, Animals and Objects Anywhere (July 15, 2006).

6. W.H. Parker, *Surveillance by Wiretap or Dictograph: Threat or Protection?*, 42 Cal. L.Rev. 727, 734 (1954) ("[C]onstant and close surveillance" is "not only more costly than any police department can afford, but in the vast majority of cases it is impossible."); *See U.S. v. Maynard*, 615 F.3d 544, 565 (D.C.Cir.2010); *See* Marc Jonathan Blitz, *Video Surveillance and the Constitution of Public Space: Fitting the Fourth Amendment to a World that Tracks Image and Identity*, 82 Tex. L.Rev. 1349, 1375 (2004) ("[O]ne of the hallmarks of new surveillance technologies is the degree to which they lower the costs, both in time and expense, of round-the-clock monitoring. Real-time human monitoring is no longer necessary, as videos and tracking devices can be supplemented with devices that automatically record a person's movements for viewing at a later time.").

therefore all evidence obtained as a result the traffic stop must be suppressed as "fruit of the poisonous tree." Defendant claims GPS technology allows the police to unreasonably invade an individual's private affairs.[7] Defendant contends that Delaware citizens have a legitimate expectation of privacy in their vehicles and their everyday movements, thereby requiring a showing and a finding of probable cause before someone or some vehicle should be subjected to 24/7 GPS tracking. Defendant argues that both the United States and Delaware Constitutions provide the right to be free from warrantless GPS surveillance, and maintains that he has preserved his constitutional claim.

The State asserts that Defendant's vehicle was lawfully stopped pursuant to probable cause developed during a multifaceted investigation, which included surveillance assisted by GPS tracking. The State argues that judicial authorization for GPS tracking is not required because citizens do not have a legitimate expectation of privacy regarding their travel on public highways. From the State's perspective, GPS surveillance of the vehicle was not the significant means by which the officers obtained their suspicions about the Defendant, and that it was information obtained from the informants, by personal surveillance and from other police work that led to the arrest. The "GPS track merely assisted investigators in conducting otherwise routine law enforcement functions."[8] Additionally, the State argues Holden has waived his constitutional claim by not spe-

cifically stating a constitutional basis for suppression, or otherwise articulating his claim as required under *Wallace*.[9]

### DISCUSSION

The United State Supreme Court held in *United States v. Knotts*, that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." [10] However, the *Knotts* Court specifically limited its holding to the facts at issue, which involved the placement of a transmitter on a container which was thereafter taken into a vehicle driven to a cabin—tracking the container as it moved from one place to another. The police followed the vehicle to the cabin and used the transmitter to maintain and regain visual surveillance. The Court reserved the question of whether "twenty-four hour surveillance of any citizen of this country . . . without judicial knowledge or supervision" would require a different result.[11]

In *U.S. v. Maynard*, the D.C. Circuit Court of Appeals addressed the issue reserved by *Knotts* and considered whether 24 hour a day tracking of the whole movements of a person who is suspected of being part of a drug distribution ring over 28 days was constitutional. The *Maynard* court found that the likelihood that someone would observe "the whole" of another person's movements over a month is "not just remote, it is essentially nil"; [12] that there is a reasonable expectation of privacy in movements over the course of a month; and that the automobile exception

---

7. Def. Opening Brf. at 4 (D.I. 28.).

8. State Brf. at 6 (D.I. 30).

9. *Wallace v. State*, 956 A.2d 630, 637–38 (Del. 2008).

10. *U.S. v. Knotts*, 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983).

11. *Id.* at 284, 103 S.Ct. 1081 ("[I]f such dragnet-type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable.").

12. *Maynard*, 615 F.3d at 560–61.

to the warrant requirement was not applicable to prolonged GPS surveillance.[13] In *Maynard*, the court reversed the conviction of a defendant where the only evidence presented was that obtained from the GPS device—no drugs were found on the defendant whose conviction was reversed.

■ This case presents the question reserved by the *Knotts* Court, addressed by the *Maynard* Court, and as applied in Delaware. Since the Delaware Constitution affords greater protection than the United States Constitution, this Court need only decide whether GPS tracking of an individual's vehicle constitutes a search under the Delaware Constitution,[14] and if so, whether judicial authorization under these circumstances, vis-à-vis a warrant, is required. Thus, while *Maynard* may well be dispositive of the questions of whether the U.S. Constitution requires a warrant for law enforcement to use a GPS tracking device, this opinion takes up the issue under Delaware law.

■ As for the State's argument that the claim was not properly articulated, this Court finds that Defendant properly asserted his constitutional claim because he argues that the use of GPS tracking to facilitate the arrest unlawfully violates Article 1, § 6 of the Delaware Constitution.

Specifically, Defendant argues that the use of the GPS device without a showing of probable cause was an unlawful search because it violated his right of privacy.

### Delaware Recognizes a Fundamental Right to Privacy.

An examination of Delaware Constitutional history and Delaware statutory law demonstrates paramount concern for the protection of individual privacy. The first search and seizure protections for Delaware citizens were contained in the Declaration of Rights and Fundamental Rules of the Delaware State:

> Sect. 17. That all warrants without oath ·to search suspected places or to seize any person or his property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend all persons suspected, without naming or describing the place or any person special, are illegal and ought not be granted.[15]

"The history of search and seizure in Delaware reflects [this] commitment to protecting the privacy of its citizens." [16]

■ Almost 50 years ago, the Delaware Supreme Court recognized a common law right to privacy.[17] "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another

---

**13.** *Id.* at 563.

**14.** The Delaware Constitution provides greater rights than the United States Constitution in the preservation of evidence used against a defendant, *Hammond v. State*, 569 A.2d 81, 87 (Del.1989), the right to confrontation, *Van Arsdall v. State*, 524 A.2d 3, 6–7 (Del.1987), the right to counsel, *Bryan v. State*, 571 A.2d 170, 175–76 (Del.1990) and the right to trial by jury. *Claudio v. State*, 585 A.2d 1278, 1289–1301 (Del.1991). Further Delaware Case law expanded Delaware constitutional protections, including an enlarged level of corroboration required for an anonymous tip to satisfy probable cause, *Flonnory v. State*, 805 A.2d 854, 859–860 (Del.2001), probation

searches must be predicated upon reasonable ground, *Donald v. State*, 903 A.2d 315, 319 (Del.2006) and a heightened burden above probable cause to justify a nighttime search warrant. *Mason v. State*, 534 A.2d 242, 248–250 (Del.1987).

**15.** Declaration of Rights and Fundamental Rules of the Delaware State.

**16.** *Jones v. State*, 745 A.2d 856, 866 (Del. 1999).

**17.** *Barbieri v. News–Journal Co.*, 189 A.2d 773, 774–76 (Del.1963) (recognizing invasion of privacy as an actionable tort).

or his private affairs or concerns, is subject to liability to the other for invasion of privacy."[18] A common law right to privacy supports the reasonableness of an expectation to be free from invasions of privacy.

This right of privacy is specifically protected by Delaware statutory law. For example, 11 *Del. C.* § 1335(a)(2) states, in relevant part, "[a] person is guilty of violation of privacy when, except as authorized by law, the person: ... (2) Installs in any private place, without consent of the person or persons entitled to privacy there, any device for observing, photographing, recording, amplifying or broadcasting sounds or events in that place." This right of privacy was specifically extended to the undercarriage of a vehicle in *Biddle v. State:*[19]

> [T]he police do not have the unfettered right to tamper with a vehicle by surreptitiously attaching a tracking device without either the owner's consent or without a warrant issued by a court. If the police whose duty is to prevent and detect crime have no such right then a private person would have no such right without the permission of the owner of the vehicle. The right to privacy is a fundamental right in a free and civilized society. The increasing use of electronic devices is eroding personal liberty.[20]

After *Biddle,* the Delaware legislature clarified that it was unlawful to "[k]nowingly install an electronic or mechanical location tracking device in or on a motor vehicle without the consent of the registered owner."[21] However, an exception was created for "the *lawful* use of an electronic tracking device by a law enforcement officer."[22] The question then is what is the lawful use of an electronic device by a law enforcement officer in Delaware.

Jurisdictions throughout the United States have found that citizens have a reasonable expectation of privacy in their prolonged travels on public thoroughfares.[23] "In a number of cases, courts appear to recognize that, even when official surveillance is focused only on public spaces, it can present a significant threat to core liberty and privacy interests."[24] Courts have used a "public exposure rationale," to hold that privacy interests are not implicated with regard to acts exposed to the public.[25] However, the monitoring of a single trip is far different than constant prolonged surveillance. "GPS and wireless telephone tracking systems allow authorities to surreptitiously monitor and record people's movements in a systematic and detailed manner over an indefinite period of time."[26]

18. *Barker v. Huang,* 610 A.2d 1341, 1350 (Del. 1992) (citing RESTATEMENT (SECOND) OF TORTS § 652(b) (1977)).

19. *Biddle v. State,* 2006 WL 1148663, at *2 (Del.Super. Feb. 14, 2006).

20. *State v. Biddle,* 2005 WL 3073593, at *2 (Del.Com.Pl. May 5, 2005).

21. 11 Del. C. § 1335(a)(8).

22. 11 Del. C. § 222(16) (emphasis added).

23. *Biddle,* 2006 WL 1148663, at *2 ("[S]tate courts have [] found that persons have an expectation of privacy with respect to the tracking of their vehicles.").

24. Blitz, *Video Surveillance and the Constitution of Public Space: Fitting the Fourth Amendment to a World that Tracks Image and Identity,* at 1377 (2004).

25. *Knotts,* 460 U.S. at 281, 103 S.Ct. 1081.

26. Penney, *Reasonable Expectations of Privacy and Novel Search Technologies: An Economic Approach,* J.Crim. L. & Criminology, at 517 (2007)

In 1988, in *Oregon v. Campbell*, the Supreme Court of Oregon held that police use of a relatively unsophisticated radio transmitter is a search under the search and seizure provision of the Oregon Constitution, and therefore, required a warrant.[27] The radio transmitter at issue in *Campbell* required constant surveillance from a car or a plane that was within a 40 mile radius of the vehicle where the transmitter was placed.[28] Even though the officers actually tracked the defendant's vehicle from a small airplane and observed him acting in a manner consistent with burglary, the court found that the use of a radio transmitter to track an individual constitutes a search, and absent exigent circumstances, requires a warrant.[29] The court found that the ability to constantly monitor a vehicle's movements within a 40 mile radius at any time "is a significant limitation on freedom from scrutiny," and "is nothing short of a staggering limitation upon personal freedom."[30]

More recently, other state courts have specifically held that GPS surveillance constituted a search and therefore required a warrant. For example, in *People v. Weaver*, the New York Court of Appeals recognized that while a person's expectation of privacy is diminished within his or her automobile, "use of a vehicle upon a public way does not effect a complete surrender of any reasonable, socially acceptable privacy expectation."[31] Constant tracking for 65 days could not realistically been achieved through any means other than GPS tracking "and that this dragnet use of [GPS] at the sole discretion of law enforce-ment authorities to pry into the details of people's daily lives is not consistent with the values at the core of our State Constitution's prohibition against unreasonable searches."[32] The court warned that while advancing technology is useful to ferret out criminal activity, "[w]ithout judicial oversight, the use of these powerful devices present a significant and ... unacceptable risk of abuse:"[33]

> The whole of a person's progress through the world, into both public and private spatial spheres, can be charted and recorded over lengthy periods possible limited only by the need to change the transmitting unit's batteries. Disclosed in the data retrieved from the transmitting unit, nearly instantaneously with the press of a button on the highly portable receiving unit, will be trips the indisputably private nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue, or church, the gay bar and on and on. What the technology yields and records with breathtaking quality and quantity is a highly detailed profile, not simply of where we go, but by easy inference, of our associations-political, religious, amicable and amorous, to name a few-and of the pattern of our professional and advocational pursuits.[34]

In *State v. Jackson*, the Supreme Court of Washington held "that citizens of

---

27. *State v. Campbell*, 306 Or. 157, 759 P.2d 1040, 1041 (1988).

28. *Id.* at 1042.

29. *Id.* at 1049.

30. *Id.* at 1048.

31. *People v. Weaver*, 12 N.Y.3d 433, 882 N.Y.S.2d 357, 909 N.E.2d 1195, 1201 (2009).

32. *Id.*, 882 N.Y.S.2d 357, 909 N.E.2d at 1203.

33. *Id.*

34. *Id.*, 882 N.Y.S.2d 357, 909 N.E.2d at 1199.

[Washington] have a right to be free from" GPS surveillance and "installation and use of a GPS device on a private vehicle involves a search and seizure under [the search and seizure provision of the Washington Constitution.]"[35] The Court cautioned "if police are not required to obtain a warrant ... before attaching a GPS device to a citizen's vehicle, then there is no limitation on the State's use of these devices on any person's vehicle, whether criminal activity is expected or not."[36] The court concluded that, absent exigent circumstances, installation and use of a GPS unit on a private vehicle is only lawful where a warrant is issued upon a showing of probable cause.

In *Commonwealth v. Connolly*, the Supreme Judicial Court of Massachusetts held that "police use of defendant's minivan to conduct GPS monitoring for their own purposes constituted a seizure,"[37] but declined to consider whether GPS monitoring constitutes a search. The court went on to require a warrant for GPS monitoring issued upon "probable cause to believe that a particularly described offense has been, is being, or is about to be committed, and that GPS monitoring of the vehicle will produce evidence of such an offense ..."[38] The court also limited the monitoring period to 15 days.[39]

States have also enacted legislation prohibiting the private use of GPS tracking devices and required exclusion of evidence obtained as a result of GPS tracking without a warrant. The California Legislature promulgated a penal statute similar to Delaware's § 1335, and explicitly acknowledged that the use of GPS devices has the potential to erode personal liberty and privacy:

> [t]he Legislature finds and declares that the right to privacy is fundamental in a free and civilized society and that the increasing use of electronic surveillance devices is eroding personal liberty. The Legislature declares that electronic tracking of a person's location without that person's knowledge violates that person's reasonable expectation of privacy.[40]

The California statute specifically carves out an exception for the *lawful* use of tracking devices by law enforcement, but, like the Delaware statute, does not specifically articulate what makes such use lawful.[41]

Pennsylvania statutory law addresses the issue of such lawfulness very specifically: 18 Pa. Cons.Stat. § 5761 permits the Court of Common Pleas to issue an order authorizing the use of mobile tracking devices upon a showing of "reasonable suspicion that criminal activity has been, is or will be in progress and that the use of a mobile tracking device will yield information relevant to the investigation of the criminal activity."[42] Further, a showing of

35. *State v. Jackson*, 150 Wash.2d 251, 76 P.3d 217, 224 (2003) (Wash. Const. art. I, § 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law.").

36. *Id.*

37. *Connolly*, 913 N.E.2d at 369.

38. *Id.* at 371.

39. *Id.*

40. 1998 Cal. Legis. Serv. Ch. 449 (S.B. 1667) § 1.

41. California Penal Code § 637.7(c) ("This section shall not apply to the lawful use of an electronic tracking device by a law enforcement agency.").

42. 18 Pa. Cons.Stat. § 5761(c)(4); *See Commonwealth v. Bart*, 1991 WL 495571 at *1 (Pa.Com.Pl. Sept. 13, 1991) ("18 Pa.C.S. § 5761 subsection (c) requires a written application for the use of a mobile tracking device,

exigent circumstances or probable cause is required if the mobile tracking device moves "within an area protected by a reasonable expectation of privacy."[43]

***Delawareans Have a Reasonable Expectation to be Free from Twenty-four Hours a Day Constant Surveillance of Their Vehicle.***

■■■ While it is true that individuals have a diminished expectation of privacy within their automobiles, they do "not lose all reasonable expectation of privacy simply because they are subject to government regulation ... Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed."[44] Although it is true that the Fourth Amendment and similar State constitutional provisions "protect people not places," and that what people expose to the public is generally not subject to constitutional protection, the test to determine whether government action constitutes an unconstitutional search remains whether the action invades on an area in which the person has a subjective expectation of privacy and whether that subjective expectation is objectively reasonable to society.[45]

Prolonged GPS surveillance provides more information than one reasonably expects to "expose to the public." The whole of one's movement over a prolonged period of time tells a vastly different story than movement over a day as may be completed by manned surveillance.[46] GPS "facilitates a new technological perception of the world in which the [location] of any object may be followed and exhaustively recorded over, in most cases, a practically unlimited period."[47] It takes little to imagine what constant and prolonged surveillance could expose about someone's life even if they are not participating in any criminal activity.[48]

GPS surveillance does not simply enhance an officer's sensory capabilities and represents more than a mere alternative to conventional physical surveillance. GPS has the capacity for obtaining and recording information which greatly exceeds the ability of conventional surveillance such that "[t]he potential for a similar capture of information or 'seeing' by law enforcement would require, at a minimum, millions of additional police officers and

and an order by the court of common pleas authorizing its use, before such device may lawfully be installed or used."); *See also* Okla. Stat., tit. 13, § 177.6 (Requiring a warrant to be issued upon "probable cause [ ] shown for believing that such installation or use will lead to the discovery of evidence"); Haw.Rev. Stat. § 803–44.7 (Warrant required based on probable cause); Minn.Stat. § 626A.37 (Warrant required based on a reason to believe GPS information will lead to relevant evidence); Utah Code Ann. § 77–23a–15.5 (Requiring judicial authorization to attach a mobile tracking device); Fla. Stat. § 934.42; S.C.Code Ann. § 17–30–140.

**43.** 18 Pa. Cons.Stat. § 5761(g).

**44.** *Delaware v. Prouse*, 440 U.S. 648, 662–63, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *See*

*Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 1720, 173 L.Ed.2d 485 (2009) ("Although we have recognized that a motorist's privacy interest in his vehicle is less substantial than in his home ... the former interest is nevertheless important and deserving of constitutional protection.").

**45.** *Katz v. U.S.*, 389 U.S. 347, 360–61, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).

**46.** *Maynard*, 615 F.3d at 558.

**47.** *Weaver*, 882 N.Y.S.2d 357, 909 N.E.2d at 1199.

**48.** *Id.*, 882 N.Y.S.2d 357, 909 N.E.2d at 1199–1200.

cameras on every street lamp." [49] The possibility is remote that law enforcement could maintain 24–hour surveillance of a suspect for a prolonged period of time. There is a "difference between [ ] uninterrupted, [constant] surveillance possible through use of a GPS device, which does not depend upon whether an officer could in fact have maintained visual contact over the tracking period, and an officer's use of binoculars or a flashlight to augment his or her senses." GPS completely replaces conventional surveillance [50] such that one officer with a single computer could record and monitor the travels of hundreds into perpetuity.[51]

Even if there is no reasonable expectation to be free from casual encounters by others in the public sphere, society reasonably expects to be free from constant police scrutiny. Everyone understands there is a possibility that on any one occasion or even multiple occasions, they may be observed by a member of the public or possibly law enforcement, but there is not such an expectation that an omnipresent force is watching your every move. Simply because our expectations of privacy are diminished in a car traveling on public roads, does not suggest "our expectations of privacy are so utterly diminished that we effectively consent to the unsupervised disclosure to law enforcement authorities of all that GPS technology can and will reveal." [52] "[D]espite the increasing use of

sophisticated technological devices, there has not been a corresponding societal expectation that government authorities will use such devices to track private citizens . . . and if no warrant is required, any individual could be tracked indefinitely without suspicion of any crime." [53] No one should be subject to such scrutiny by police without probable cause.

The advancement of technology will continue *ad infinitum*. An Orwellian state is now technologically feasible. Without adequate judicial preservation of privacy, there is nothing to protect our citizens from being tracked 24/7. Delawareans reasonably expect to be free from prolonged 24–hours a day surveillance. Use of GPS technology without adequate judicial supervision infringes upon the reasonable expectation of privacy and absent exigent circumstances or a warrant issued upon probable cause, violates Article I, § 6, of the Delaware Constitution.

The GPS tracking system used by the Task Force would have allowed the officers to monitor and record the location of the Defendant's vehicle 24 hours a day for as long as the battery on the device lasted, or longer if the battery was recharged or replaced. As it was, the police tracked and recorded the location of the vehicle for 20 days without a warrant. The State claims now that the GPS device only augmented their surveillance on February 24th, and attempts to minimize the contri-

---

**49.** *Id.*, 882 N.Y.S.2d 357, 909 N.E.2d at 1199.

**50.** *Connolly*, 913 N.E.2d at 369 ("GPS devices replace rather than enhance officers' physical abilities").

**51.** *United States v. Garcia*, 474 F.3d 994, 998 (7th Cir.2007) ("One can imagine the police affixing GPS tracking devices to thousands of cars at random, recovering the devices, and using digital search techniques to identify sus-

picious driving patterns. One can even imagine a law requiring all new cars to come equipped with the device so that the government can keep track of all vehicular movement in the United States.").

**52.** *Weaver*, 882 N.Y.S.2d 357, 909 N.E.2d at 1200.

**53.** *Connolly*, 913 N.E.2d at 369.

bution made by the GPS device. But it was the GPS device that provided the Task Force the location of the house in Carney's Point, and the location of the vehicle as it crossed the Delaware Memorial Bridge on its way back to Delaware. Moreover, the police placed the GPS device weeks before they had specific information about the drug shipment and have not alleged that they used the GPS device to simply augment their surveillance of the vehicle as they tracked it from Carney's Point to Delaware.[54] Based on the facts presented, it appears that the police stopped their surveillance of the vehicle and relied exclusively on the GPS device to locate the vehicle in Delaware when they ordered the traffic stop.

The Task Force violated the Defendant's reasonable expectation of privacy and state Constitutional rights by surreptitiously placing a GPS unit on his car and tracking his location 24 hours a day for multiple weeks.[55] Consequently, the Defendant's Motion to Suppress is **GRANTED.**

**IT IS SO ORDERED.**

---

54.  *Cf. Knotts*, 460 U.S. at 283, 103 S.Ct. 1081 (tracking device was used to maintain and regain surveillance of the vehicle as police officers followed it).

55.  This Opinion does not in anyway state or imply that law enforcement can not use GPS technology to investigate suspects. It only requires that a warrant be justified and issued before law enforcement may use GPS technology to monitor individuals for a prolonged period of time.