Lowy, David A., J.
Defendants Francis Wyatt, Yoshie Stackerman, Joel Javier, and Cauris Gonzalez are each charged in separate, one-count indictments with murder in violation of G.L.c. 265, §1. Defendant Maribel Villafane is charged in a two-count indictment with accessory after the fact in violation of G.L.c. 274, §4, and misleading a judge, juror, grand juror, prosecutor, police officer, federal agent, investigator, defense attorney, clerk, court officer, probation officer, or parole officer in violation of G.L.c. 268, § 13B(1)(c)(iii). The defendants move to suppress all records of their historical cellular tower site location information (CSLI) that the Commonwealth seized pursuant to a warrantless search of the defendants’ cellular telephone records.[2] After reviewing the parties’ submissions and the relevant law, the defendants’ motions to suppress historical cellular tower site location information are ALLOWED.
FINDINGS OF FACT
On January 10, 2009, Roberto Gonzalez was shot and killed in Lawrence, Massachusetts. As a result of Roberto Gonzalez’s murder, the Lawrence Police Department began an investigation, which included the interview of approximately forty witnesses. As the investigation progressed, Wyatt, Stackerman, Javier, Gonzalez, and Thomas Castro became the lead suspects.
On March 5th, 9th, 12th, and April 28th, 2009, the Essex County District Attorney’s office submitted to two justices of the Superior Court nine separate applications for orders requiring five different cellular telephone companies to disclose information concerning specific subscriber accounts. The applications were made pursuant to 18 U.S.C. §2703(d), which provides:
A court order for disclosure [of certain electronic communication information] may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records of other information sought, are relevant and material to an ongoing criminal investigation. (Emphasis added.)
In addition to seeking subscriber information and call records for twenty-nine telephone numbers for the time period from January 9, 2009 to March 1, 2009,[3] the Essex County District Attorney’s office sought CSLI for eighteen telephone numbers for January 10, 2009.[4] The CSLI sought included information for the telephone numbers used by Wyatt, Stackerman, Javier, Gonzalez (two numbers), and Villafane. The Commonwealth’s applications were allowed.
This court briefly describes how CSLI is obtained.[5] Cellular telephones use radio waves to communicate between the user’s cellular telephone and the service network. Service providers maintain radio base stations throughout the providers’ geographic coverage areas. A wireless antenna at each base station detects *271 a cellular telephone’s radio signal and connects the radio signal to the local service network or another wireless network. When turned on, cellular telephones periodically and automatically connect to nearby base stations as the cellular telephone moves throughout the coverage area. This process is known as registration. When a cellular telephone moves closer to another base station during a call, the call is “handed off’ between the base stations without interruption.
The position of a cellular telephone can be determined using a network-based approach. Using the network-based approach, a cellular telephone’s position is calculated based on data collected and analyzed at the base station receiving the cellular telephone’s signals.[6] The cellular telephone’s location is calculated by the phone’s communication with a particular base station eveiy time the cellular telephone makes or receives a call, or when the cellular telephone moves from one sector to another. The precision by which the cellular telephone’s position is determined depends on the size of the sector; the smaller the sector is, the more precise the location fix is. The network provider automatically calculates cellular telephone location information and creates “call detail records” that include the most accurate location information available.
RULINGS OF LAW
Because the Commonwealth’s applications to obtain the defendants’ CSLI were not accompanied by search warrants supported by probable cause,[7] the defendants contend that the Commonwealth unlawfully obtained these records in violation of their rights under the Fourth and Fourteenth Amendments to the United States and Article 14 of the Massachusetts Declaration of Rights. Because this court concludes that Article 14 of the Massachusetts Declaration of Rights requires that law enforcement officials obtain a search warrant when seeking a suspect’s CSLI, this court does not address the defendants’ Fourth Amendment argument.[8]
I. Similarity Between Cellular Telephones and Global Positioning System Devices
Because most citizens carry their cellular telephones on their person (pants pocket, attached to the waistband of their pants, in their pocketbook, etc.), CSLI enables a cellular telephone to be treated as a de facto Global Positioning System (GPS) tracking device. The information conveyed by a GPS and a cellular telephone is analogous, because both devices track the user’s location. See In the Matter of the Application of the United States of America for an Order Directing a Provider of Electronic Communication Service to Disclose Records to the Government, 620 F.3d at 312 (cell site location information “may resemble a tracking device which provides information as to the actual whereabouts of the subject”); In re Application of the United States of America for Historical Cell Site Data, 747 F.Sup.2d at 840 (“[T]he level of detail provided by cell site technology now approaches that of GPS, and its reliability in obtaining a location fix actually exceeds that of GPS”); Commonwealth v. Pitt, 2012 WL 927095 at *7 (Mass.Super. 2012) (Cosgrove, J.) [29 Mass. L. Rptr. 445] (describing cellular telephones as “defacto G.P.S. tracking devices”).
Because GPS devices and cellular telephones provide similar tracking capabilities, it is important to understand how the Supreme Judicial Court and the Supreme Court have decided cases involving GPS tracking. Within the past three years, both the Supreme Judicial Court and the Supreme Court have decided cases involving whether the attachment of a GPS device to a vehicle requires a warrant. In Commonwealth v. Connolly, the Supreme Judicial Court held that the installation of a GPS device to the engine compartment of a vehicle requires a search warrant because it constitutes a seizure under Article 14. 454 Mass. 808, 818 (2009). In United States v. Jones, the Supreme Court held that the installation of a GPS device to the exterior of a vehicle constitutes a search within the meaning of the Fourth Amendment because the device physically occupies private property. 132 S.Ct. 945, 950 (2012). In the context of this case, the Supreme Judicial Court’s and the Supreme Court’s decisions are important because of the concurring opinions in each case. Connolly and Jones will be discussed in detail below.
In Connolly, a GPS device was attached to the battery of Connolly’s vehicle. 454 Mass. at 812. This allowed the government continuously to monitor the vehicle’s location without Connolly’s knowledge. Id, Connolly was convicted of trafficking in cocaine and distribution of cocaine. Id. at 809. On appeal, Connolly argued that the “surreptitious GPS monitoring without a warrant constitutes an unreasonable search and seizure that violates the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.” Id, at 818.
The Supreme Judicial Court limited its discussion to Article 14, and held that the “installation and use of the GPS device in the circumstances of this case [device was attached to the vehicle’s power source] was a seizure requiring a warrant[.]” Id, at 818. The government’s conduct constituted a seizure “not by virtue of the technology employed, but because the police use[d] private property (the vehicle) to obtain information for their own purposes.” Id, at 823. The Supreme Judicial Court further opined, “(t]racking of the GPS data by the police constituted use and control of the defendant’s [vehicle] by them, and interfered with the defendant’s right to exclude others from his vehicle.” Id. The majority emphasized that the Supreme Judicial Court did not address whether “use of a GPS device also constitutes a search.” Id, at 823 n.13.
Justice Gants’s concurrence, which was joined by Justices Cordy and Botsford, agreed with the *272 majority’s decision that the installation of the GPS device constituted a seizure, but “differ[ed] with the court’s conclusion that the use of the minivan to conduct GPS monitoring constitute [d] a seizure of the property regardless [of] whether the GPS device was installed inside the vehicle.” Connolly, 454 Mass. at 832-33 (Gants, J., concurring). Justice Gants criticized the majority’s singular focus on the government’s physical intrusion of the vehicle because in his opinion the “appropriate constitutional concern [was] not the protection of property but rather the protection of the reasonable expectation of privacy... [because] without judicial oversight based on a finding of probable cause, the police potentially could engage in GPS monitoring of any individual and, through this device, learn what otherwise could be learned only through physical surveillance conducted seven days per week, twenty-four hours per day.” Id. at 833. Justice Gants expanded this thought, writing, “the expectation of privacy on which an individual justifiably relies is that his [or her] comings and goings will not be continuously and contemporaneously monitored except through physical surveillance!.]” Id. at 835. Justice Gants contends that the majority’s focus on Connolly’s property interest, as opposed to his privacy interest, ignores the fact that devices can track an individual’s movement without requiring the government, to “seize” a portion of the individual’s property, such as cellular telephones and vehicles pre-equipped with navigation devices. Id. at 835-36.
In Jones, the Supreme Court held that “the Government’s installation of a GPS device on an individual’s vehicle, and use of that device to monitor the vehicle’s movements, constitutes a ‘search.’ ” 132 S.Ct. at 949. The five-justice majority[9] concluded that the physical occupation, trespass, of the defendant’s vehicle for the purpose of obtaining information was a search within the meaning of the Fourth Amendment. Id. The majority declined to determine whether the installation of the GPS device violated the defendant’s reasonable expectation of privacy. Id. at 953 (“[W]e do not make trespass the exclusive test. Situations involving merely the transmission of electronic signals without trespass would remain subject to Katz [v. United States, 389 U.S. 347 (1967)] analysis” (emphasis in original)).
Justice Alito authored a concurrence that Justices Ginsberg, Breyer, and Kagan joined. Id. at 957 (Alito, J., concurring). Justice Alito opined that the majority’s reliance “on the law of trespass will present particularly vexing problems in cases involving surveillance that is carried out by making electronic, as opposed to physical, contact with the item to be tracked.” Id. at 962. Justice Alito, therefore, framed the issue as “whether respondent’s reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.” Id. 958. Justice Alito concluded the government’s conduct involved a degree of intrusiveness that a reasonable person would not have anticipated, and, therefore, constituted a search under the Fourth Amendment. Id. at 964.[10] Specifically, Justice Alito wrote that:
Under this approach, relatively short-term monitoring of a person’s movements on public streets accords with expectations of privacy that our society has recognized as reasonable. [Citation omitted.] But the use oflonger term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society’s expectation has been that law enforcement agents and others would not — and indeed, in the main, simply could not — -secretly monitor and catalogue eveiy single movement of an individual’s car for a very long period. In this case, for four weeks . . . We need not identify with precision the point at which the tracking of this vehicle became a search, for the line was crossed before the 4-week mark.
Id. at 964.
II. Article 14 of the Massachusetts Declaration of Rights
A. Historical Development of Article 14
The need for the protections articulated in Article 14 of the Massachusetts Declaration of Rights can be traced to the events that occurred in the American colonies prior to the Revolutionary War. In 1755, the Colonial Governor of the Massachusetts Bay Colony began issuing writs of assistance to customs officials, in an attempt to stop the colonists from smuggling goods into the colonies. John M. Burkoff, “A Flame of Fire”: The Fourth Amendment in Perilous Times, 74 Miss.L.J. 631, 634-35 (2004). Writs of assistance were general warrants that authorized customs officials to search wherever and whenever they suspected smuggled and untaxed goods could be found. Id. at 633-35. The government was not required to show any level of cause before obtaining a writ of assistance. Massachusetts Judicial Branch, John Adams and the Massachusetts Constitution (2010), http://www.mass.gov/ courts/sjc/john-adams-b.h tml at par. 4 (last viewed August 2, 2012).
Writs of assistance expired six months after the King or Queen of England died. Therefore, when King George II died on October 25, 1760, customs officials in the colonies had until April 25, 1761 to obtain new writs of assistance. Burkoff, supra at 633. Shortly after King George II’s death, the “Surveyor General of Customs in the Massachusetts Bay Colony petitioned the Superior Court of the Colony to issue, as he put it, in the ‘usual’ fashion, new writs of assistance for his use and for the use of his subordinate officers.” Id. at 635. James Otis, Jr., was hired by a group of local merchants who opposed the government’s petition for new writs of assistance.[11] Id. at 635-36. Otis and the merchants challenged the legality of the new writs in the Superior Court of Judicature. Id. Otis argued that the writs of assistance were unjust, unconstitutional, and were “the worst instrument of arbitrary power, the *273 most destructive of English liberty, and the fundamental principles of law, that ever was found in an English lawbook[.]” Id. at 638; see also Joseph A. Grasso, Jr., “John Adams Made Me Do It”: Judicial Federalism, Judicial Chauvinism, and Article 14 of Massachusetts’ Declaration of Rights, 77 Miss.L.J. 315, 319 (2007).
Although Otis lost in his attempt to prevent the renewal of the writs of assistance, his impassioned plea inspired a young John Adams, who was observing the proceedings from the gallery.[12] Burkoff, supra at 639; Massachusetts Judicial Branch, supra at par. 3. In 1780, with the writs of assistance case fresh in his mind, John Adams drafted the Massachusetts Constitution, and, with Article 14, included a strong prohibition against unreasonable searches and seizures. Massachusetts Judicial Branch, supra at par. 3; David McCullough, John Adams 61-62, 220-21 (Simon'& Schuster Paperbacks 2001).
B . Substantive Analysis of Article 14
Article 14 of the Massachusetts Declaration of Rights is implicated when an individual “demonstrate[s] that there existís] governmental -action, standing, and an expectation of privacy.” J.A. Grasso, Jr. & C.M. McEvoy, Suppression Matters Under Massachusetts Law, §3-2, at 3-3 (2009-2010 ed.).[13] The privacy interests protected under art. 14 “exist when it is shown ‘that a person [has] exhibited an actual (subjective) expectation of privacy,’ and when that ‘expectation [is] one that society is prepared to recognize as reasonable.’ ” Commonwealth v. Blood, 400 Mass. 61, 68(1987), quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (internal quotation omitted). “The critical point is whether [the defendant’s subjective] expectation [of privacy] is one that society would recognize as objectively ‘reasonable,’ ‘justifiable,’ or ‘legitimate.’ ” Commonwealth v. One 1985 Ford Thunderbird Auto., 416 Mass. 603, 607 (1993), citing Commonwealth v. Panetti, 406 Mass. 230, 231 (1989).
The Supreme Judicial Court has on many occasions interpreted Article 14 to provide greater protections than the Fourth Amendment to the United States Constitution in the area of searches and seizures.[14] See, e.g., Commonwealth v. Balicki, 436 Mass. 1, 9 (2002) (declining to abandon the inadvertence requirement of the plain view exception to the warrant requirement under Article 14 as the Supreme Court did under the Fourth Amendment); Commonwealth v. Gonsalves, 429 Mass. 658, 663 (1999) (under Article 14, unlike under the Fourth Amendment, a police officer may not order the occupants of a lawfully stopped vehicle out of the vehicle as a matter of course); Commonwealth v. Stoute, 422 Mass. 782, 789 (1996) (person is seized under Article 14 when police pursue the person with the obvious intent of requiring him or her to submit to questioning, rejecting Supreme Court’s decision in California v. Hodari D., 499 U.S. 621 (1991)); Blood, 400 Mass. at 67-74 (1987) (statute not requiring a search warrant and allowing one-parly consent to electronically record conversations in an another person’s home violates art. 14, but not the Fourth Amendment); Commonwealth v. Upton, 394 Mass. 363, 373 (1985) (“We conclude that art. 14 provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause”); Herbert P. Wilkins, The Massachusetts Constitution — The Last Thirty Years, Suffolk U.L.Rev. 331, 337 (2011) (“In the past three decades, the Supreme Judicial Court has resisted urgings to relax the requirements of art. 14 to conform to the Supreme Court’s"revisions of Fourth Amendment law”); Robert J. Cordy, Criminal Procedure find the Massachusetts Constitution, 45 New Eng.L.Rev. 815, 821 (2011) (“[T]he SJC has repeatedly concluded that Article 14’s protections against unreasonable searches and seizures are broader and more restrictive of police power than those of the Fourth Amendment”).
Subjective Expectation of Privacy.
The issue this court must first decide is whether the defendants exhibited a subjective expectation of privacy in the CSLI producéd by their cellular telephones and retained by their service providers. This court finds that the defendants did exhibit a subjective expectation of privacy in the CSLI produced by their cellular telephones.
While some noble and perhaps lucky souls — remnants of an age when the purity and pursuit of thought was sheltered from the current barrage of instantly accessible information — may resist, most people use cellular telephones as they have become a personal and professional necessity. A cellular telephone user does not take any affirmative or overt steps to communicate his or her physical location to his -or her service provider. Because CSLI “is generated automatically by the network, conveyed to the provider not by human hands, but by invisible radio signal[s,]” these records do not require the cellular telephone user to undertake an affirmative or overt action. In the Matter of the Application of the United States of America for an Order Directing a Provider of Electronic Communication Service to Disclose Records to the Government, 620 F.3d at 317-18 (“[I]t is unlikely that cell phone customers are aware that their cell phone providers collect and store historical location information. Therefore, ‘[w]hen a cell phone user makes a call, the only information that is voluntarily and knowingly conveyed to the phone company is the number that is dialed and there is no indication to the user that making that call will also locate the caller; when a cell phone user receives a call, he hasn’t voluntarily exposed anything at all.’ ” (Further citation omitted, alterations in original.)). See also Brief of Amicus Curiae Electronic Privacy Information Center Urging Affirmance at 4, In re: Applications of the United States of America for Historical Cell-Site Data, No. 11-20884 *274 at 18 (5th Cir. Mar. 16, 2012) (“[D]ata is generated automatically without user knowledge or control”). It is unlikely that the average cellular telephone user knows that when he or she makes or receives a call or a text message, the service provider creates and maintains a record of the cellular telephone’s location. In the Matter of the Application of the United States of America for an Order Directing a Provider of Electronic Communication Services to Disclose Records to the Government, 620 F.3d at 317-18 (it is unlikely that cellular telephone “customers are aware that their cell phone providers collect and store historical location information” (emphasis in original)); In re Application of the United States of America for Historical Cell Site Data, 747 F.Sup.2d at 844 (“[E]ven a tech-sawy cell phone user would not expect that anything more than an approximate location, such as his [or her] general neighborhood or area code, would be necessaiy for the network to complete a call”); Pitt, 2012 WL 927095 at *4 (“Where the average cell phone user is not even aware that use of his [or her] cell phone creates a record of his [or her] location, much less that such use causes this information to be conveyed to the cell phone company, use of a cell phone is in no way inconsistent with a subjective expectation of privacy in the user’s physical location”).
This court concludes that the defendants had a subjective expectation of privacy in their CSLI and, therefore, turns to whether the defendants’ subjective expectation of privacy is a privacy interest that society recognizes as reasonable.
Objectively Reasonable Expectation of Privacy
An individual’s subjective expectation of privacy in his or her CSLI is a privacy interest that society is prepared to recognize as reasonable.
When James Otis argued against writs of assistance and John Adams drafted Article 14, neither man could have envisioned future technological advancements nor that as of December 31, 2011, there would be approximately 331,594,848 active cellular telephones in the United States. CTIA-The Wireless Association, Semi-Annual Wireless Survey (2012). Further, it is unlikely that either man could foresee that Americans would be so dependent on their cellular telephones that these devices would often be within arm’s reach. In light of the pervasiveness of cellular telephones, and the fact that cellular telephones automatically transmit and record an individual’s location and movements, allowing the government to access an individual’s CSLI without establishing probable cause or even reasonable suspicion that the individual has engaged in criminal activity distorts Article 14’s protections beyond recognition. Allowing the government to track our movements without evidence that the person whose CSLI is sought engaged in criminal activity compromises what it means to be a citizen of the United States of America free from arbitrary surveillance.
Cellular site location information has the potential to create and provide a comprehensive map of an individual’s every movement. The use of an individual’s CSLI, therefore, allows the government unfettered access to the details of an individual’s private life,[15] details of which the individual may choose to share or not share with other people. The New York Court of Appeals explained the “indisputably private nature” of the information a tracking device could disclose:
trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on. What the technology yields and records with breathtaking quality and quantity is a highly detailed profile, not simply of where we go, but by easy inference, of our associations — political, religious, amicable and amorous, to name only a few — and of the pattern of our professional and avocational pursuits.
People v. Weaver, 12 N.Y.3d 433, 441-42 (2009).
Technological advances should not elicit Orwellian consequences, and they may not when they contravene the core of our liberty reflected in Article 14 of our Declaration of Rights — the right to privacy. As Americans, we awake every morning and “breath free.”[16] Allowing the government to track a citizen’s movement through CSLI, without requiring the government to show probable cause or even reasonable suspicion that the target is engaged in criminal activity is contrary to the very freedom we hold dear. Certainly, the government is not prohibited from obtaining CSLI. The government, however, is only entitled to this information after complying with the protections afforded under Article 14. To rule otherwise would dismantle the concept of ordered liberty that the drafters of Article 14 crafted with such care and courage.
ORDER
For the reasons stated above, Francis Wyatt’s, Yoshie Stackerman’s, Joel Javier’s, Cauris Gonzalez’s, and Maribel Villafane’s motions to suppress all records of their historical cellular tower site location information is ALLOWED.

 Wyatt, Javier, and Villafane each filed separate motions to suppress. Stackerman filed a motion to join Wyatt’s motion to suppress. Gonzalez filed a motion to join any and all motions to suppress filed by her co-defendants.

 Of the eighteen telephone numbers, six were connected to the defendants in this case. Telephone number (978) 490-7199 was registered to a cellular telephone used by Wyatt *275 and identified the telephone number subscriber as Christina Brage. Telephone numbers (978) 397-1836 and (978) 397-4043 were registered to cellular telephones used by Gonzalez and identified her as the telephone number subscriber. Telephone number (978) 902-3475 was registered to a cellular telephone used by Javier and identified him as the telephone number subscriber. Telephone number (978) 902-2216 was registered to a cellular telephone used by Stackerman and identified Javier as the subscriber of the telephone number. Telephone number (978) 994-8920 was registered to a cellular telephone used by Villafane and identified Villafane as the telephone number subscriber.

 During the hearing on the defendants’ motions to suppress, the Commonwealth conceded that the applications for CSLI were not supported by probable cause.

 To the extent this court discusses CSLI in greater detail than it was presented during the hearing on the defendants’ motions to suppress, this background information is derived from the court’s inherent power to take “judicial notice of scientific facts.” Commonwealth v. Lykus, 367 Mass. 191, 203 (1975); see also Commonwealth v. Whynaught, 377 Mass. 14, 17 (1979) (“[Tjhose courts which have considered the issue have almost uniformly taken judicial notice of radar’s underlying scientific principles!.]"). Much of this court’s background discussion regarding cellular telephone technology was articulated by the United States District Court in In re Application of the United States of America for Historical Cell Site Data, 747 F.Sup.2d 827, 831-33 (S.D.Tex. 2010) (Smith, Mag. J.), appeal docketed, No. 11-20554 (5th Cir. Dec. 14, 2011).

 A cellular telephone’s position can also be calculated using a handset-based (GPS) approach. Because this approach is not implicated in this case, this court will not discuss it.

 The Commonwealth’s application for a court order complied with the requirements of 18 U.S.C. §2703(d). The application, however, was not accompanied by a search warrant and was not supported by probable cause. See supra, note 4.

 Federal courts are split regarding whether a suspect has a Fourth Amendment privacy interest in the contents of his or her CSLI. Compare In the Matter of an Application of the United States of America for an Order Authorizing the Release of Historical Cell-Site Information, 809 F.Sup.2d 113, 119-20 (E.D.N.Y. 2011) (Garaufis, J.) (“[C]ell-phone users maintain a reasonable expectation of privacy in long-term cell-site-location records and . . . the Government’s obtaining these records constitutes a Fourth Amendment search”), In re Application of the United States of America for Historical Cell Site Data, 747 F.Sup.2d at 845 (Federal case law does “not permit warrantless law enforcement access to all historical cell site data, because the user has not ‘knowingly exposed’ or Voluntarily conveyed’ that information to the provider!.]”), and In the Matter of an Application of the United States of America for an Order Authorizing the Release of Historical Cell-Site Information, 736 F.Sup.2d 578, 582 (E.D.N.Y. 2010) (Orenstein, Mag. J.) (Fourth Amendment prohibits government from obtaining CSLI for approximately two-month period in the absence of a showing of probable cause), with In the Matter of the Application of the United States of America for an Order Directing a Provider of Electronic Communications to Disclose Records to the Government 620 F.3d 304, 313 (3rd Cir. 2010) (”[C]ell site location information is obtainable under [18 U.S.C. §2703(d)] and . . . such an order does not require the traditional probable cause determination”), In the Matter of the Application of the United States of America for an Order Pursuant to Title 18, United States Code, Section 2703(D) to Disclose Subscriber Information and Cell Site Information, 2012 WL 989638 at *2 (D.Mass. 2012) (Collings, Mag. J.) (government does not have to establish probable cause to obtain CSLI), United States v. Graham, 2012 WL 691531 at *18 (D.Md. 2012) (Bennett, J.) (”[G]overnment’s acquisition of historical cell site location records did not infringe the Defendants’ Fourth Amendment rights”), and id. at *4 (listing additional federal cases holding that government’s application for CSLI does not implicate the Fourth Amendment). The federal courts’ holding that the Fourth Amendment is implicated when the government seeks access to an individual’s CSLI have involved applications seeking records for a prolonged period of time. See In the Matter of an Application of the United States of America for an Order Authorizing the Release of Historical Cell-Site Information, 809 F.Sup.2d at 118 (application requested CSLI for a period of 113 days); In re Application of the United States of America for Historical Cell Site Data, 747 F.Sup.2d at 829 (sixty days); In the Matter of an Application of the United States of America for an Order Authorizing the Release of Historical Cell-Site Information, 736 F.Sup.2d at 578-79 (fifty-eight days).
. In Graham, the District Court held that an individual does not have an expectation of privacy in his or her CSLI because an individual “voluntarily transmitís] signals to cellular towers in order for [his or her] calls to be connected. The cellular provider then create[s] internal records of that data for its own business purposes.” 2012 WL 691531 at * 13. This is known as the third-party doctrine. Id. at *14. See also Brief for the United States at 16-28, In re Applications of the United States of America for Historical Cell-Site Data No 11-20884 (5th Cir. Feb. 15, 2012) (arguing CSLI is the service provider’s business records rather than the customer’s private papers and, therefore, customers have no expectation of privacy in this information). In In the Matter of an Application of the United States of America for an Order Authorizing the Release of Historical Cell-Site Information, the District Court held that “cumulative cell-site location records implicate sufficiently serious protected privacy concerns that an exception to the third-party-disclosure doctrine should apply to them, as it does to content, to prohibit undue governmental intrusion.” 809 F.Sup.2d at 126. This court does not address the third-party doctrine issue.

 Justice Sotomayor joined the majority decision. However, she also filed a concurring opinion. Jones, 132 S.Ct. at 954 (Sotomayor, J., concurring). Justice Sotomayor agreed that obtaining information by physically intruding on a constitutionally protected area constitutes a search within the meaning of the Fourth Amendment. Id. Justice Sotomayor, however, took this opportunity to criticize the voluntary disclosure, i.e., third-party disclosure, approach previously articulated by the Supreme Court in earlier cases, because it is “ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of canying out mundane tasks.” Id. at 957.

 Justice Alito emphasized that without the use of electronic devices, such as GPS, around-the-clock monitoring would require a large team of law enforcement agents, multiple vehicles, and perhaps aerial assistance — resources that would only be expended on investigations of unusual importance. Id. at 963-64.

 In 1760, Otis was the Acting Advocate General for the Massachusetts Bay Colony and was asked to argue in support of the writs of assistance. Burkoff, supra at 636. Otis refused to argue in favor of the writs of assistance and resigned from his position as the Acting Advocate General. Id. Because Otis was so vehemently opposed to the use of writs of assistance, he refused to accept payment from the merchants on whose behalf he argued. Id. at 637.

 Later recalling Otis’s argument, John Adams stated, “Every man of an [immense] crowded Audience appeared to me to go away, as I did, ready to take up Arms against Writts of Assistance [sic]. Then and there was the first scene of the first Act of Opposition to the arbitrary Claims of Great Britain. Then and there the child Independence was bora. In fifteen years, i.e. 1776, he grew up to manhood, declared himself *276 free.” Burkoff, supra at 639 (further citation omitted) (alterations in original).

 Govemmental action is present because the Lawrence Police Department in conjunction with the Essex County District Attorney’s office applied for the court order to obtain records of the defendants’ CSLI. Because each defendant has a substantial possessory interest in the privacy of his or her CSLI records, each defendant has standing to pursue this motion to suppress.

Article 14 states:
Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation: and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws.

 The fact that the police only sought one day’s worth of the defendants’ CSLI and not CSLI for a prolonged period of time is not dispositive of the defendants’ privacy interest. An individual’s privacy interest in the CSLI generated by his or her cellular telephone cannot be affected by the amount of CSLI the government seeks. Smith v. Maryland, 442 U.S. 735, 749 (1979) (Marshall, J., dissenting) (“Privacy is not a discrete commodity possessed absolutely or not at all”).

Emma Lazarus, The New Colossus, available at http: //www.nps.gov/stli/histoiyculture/upload/new%20c olossus%20for%20displaypage2.pdf (last visited August 6, 2012).